He and I are pleased to have Judge Darragh of the District of Illinois sitting with us today, so welcome. And our first case for argument, United States v. Thomas and Taylor, Ms. Christensen. Thank you, Your Honor. May it please the Court, Counsel. Good morning. My name is Joanna Christensen, and I represent the appellant, Stiles Taylor, in this case. To give the Court a little roadmap about what my counsel and I will be sharing, I'm going to be arguing the Montrell-Taylor evidence and all the issues surrounding that, and if I get to it, some of the sentencing issues that remain. My co-counsel, Ms. Benjamin, is going to argue the spectator conduct issue. The first part of the Montrell issue this morning is that his statement was coerced. He gave a statement at the age of 15 years old, when he was in juvenile detention, to several law enforcement agents that were there. Similar to someone pouring poison at the headwaters of the Mississippi at Lake Itasca, that interrogation infected all of the proceedings since then. That was in 2000. The 2001 grand jury, the 2003 grand jury, the 2004 trial, and the 2012 trial. This Court has held that the Third Party's Fifth Amendment violation can rise to a level where it deprives a defendant of a fair trial, and this case is one of those cases. The confessions wrung out of their makers are unreliable. If we look at the totality of the circumstances in this case, Montrell was 15. He was incarcerated far from home, with no parents and no friendly adult present. The only adult supposedly on his side was one of the investigators at the facility, and all that person did was gave him the Miranda form, told him to sign it, and said if he didn't cooperate, he would go to the hole. How much does his testimony conflict with the other evidence, Nikki? There are several sets of evidence that we'll talk about. We'll talk about pre-March 20, 2000, where the government presented evidence that the defendants may have been conspiring to commit the crime, to rob a gun shop, to rob drug dealers, and then the day of the crime, and then very little, Montrell particularly, about what happened after, although there are several confessions. The pre and during evidence was all over the place. Montrell said that Stiles and Keon, Mr. Taylor and Mr. Thomas, were there and planning it. Other people said that they weren't. The day of the robbery, Montrell said that he saw them and didn't see them until much later. Some witnesses confirmed that. Some witnesses did not. And afterwards, Montrell's main testimony was that Mr. Taylor, Stiles, his brother, had confessed to him about committing a lick. That evidence was, Montrell was really the only one who gave that evidence. Other people said that Thomas said he committed a lick and that Mr. Taylor had shot the victim. Did he object to Montrell's testimony? Yes. Defense counsel continuously objected to Montrell's testimony on a varying basis. As you can see from our brief, we're arguing both about the coercion, the use of it for impeachment evidence, and the extrinsic nature of the videotape that was entered. It's all coexisting in this case. Defense counsel did object at both trials. The difference is, and I know the government says that we waived it because we didn't raise this issue on a prior appeal or file a motion prior to trial the second time. However, the nature of Montrell's testimony changed significantly between 2004 and 2012. In 2004, he denied some of the, what I call peripheral evidence that he had testified to in his, or testified to the grand jury to and in his statement about who he had seen when, what the statements were prior to the murder. But the one thing, the primary piece of evidence that's at issue here, in 2000, he still admitted that Mr. Taylor, Stiles Taylor, told him he committed the robbery. In 2012, that was no longer the case. He denied that. That's the primary evidence that really is argued about when we're talking about an admission. Well, what had he told the grand jury? He told the grand jury that Mr. Taylor had committed a lick or committed a robbery, or told him he had done it. Well, that was admissible, wasn't it? The grand jury testimony is admissible, Your Honor. But, again, that goes back to- So why wasn't it left to the jury to decide which version of Montrell's testimony to believe? It was left to the jury. The problem is there are so many versions, and admitted for so many different reasons, that it becomes confusing to the jury. And the problem is, one, the coercion, two, then the extrinsic evidence of the unsworn testimony, essentially, during the coerced video statement, which Montrell- So did you say it should be excluded because it was confusing? I think that's one reason, Your Honor. I think there are several reasons. Is that a reason that was given at the trial? I don't know for sure off the top of my head. I know that this was so heavily litigated that confusion might have come up, but I know the primary reason to object to the videotape was that it was going to be used improperly for impeachment purposes and for substantive evidence. I'm sorry. One of the arguments you make in your papers is that the videotape should not have been admitted because Montrell admitted that he said those things on a videotape. Do you recall that? I don't necessarily recall that argument. I think our argument was more that it was extrinsic. Certainly, that was prejudicial because it would confuse the jury. I could be wrong about that. Why would it confuse the jury? I don't understand. The jury is being presented with all this testimony from Montrell. It's basically you have three transcript testimony from Montrell and then the videotape. The three transcripts were admitted because they're substantive evidence and they were sworn statements from him. Then you have what's probably a more powerful evidence, which is the videotape. The interview happened shortly after the crime. It could be argued that it was more reliable because of that and someone would put more weight on the video because it happened so closely to the time rather than now one year later, three years later, four years later, 12 years later. I think videotape evidence, particularly of a witness saying a defendant has confessed, is very prejudicial. I don't understand you. Why is videotape evidence prejudicial? I think because the nature of this evidence, not in general, but the nature of this evidence was that it was simply being brought in for substantive evidence. The government asked questions based on what was said in the videotape rather than necessarily what was said at the trial or the grand jury. I think the nature in which it was used was prejudicial in this case. I don't understand you. What's the difference between video evidence and personal evidence? I think because Montrell was a very difficult witness for the government, for the defense, for everyone, that the presentation of a videotape in which he's not being difficult, where he's crying and sobbing. You've lost me completely. You say in the videotape he's not being difficult. Well, that would suggest the videotape evidence is better evidence than other evidence he gave. So why wouldn't you want the jury to see it? Because it was unsworn and it contained a confession by the defendant, one of the defendants. Doesn't the government also offer the alternative rationale for the admission of the videotape is that it goes to rebut Montrell's assertion that he was coerced and that the videotape should have been admitted, if not for the truth of the matter, the declarations contained in the tape, should be admitted to rebut the defendant's assertion that Montrell was coerced because on the videotape he was relatively composed? I think that that could be an argument. However, if you look at the entire testimony, what the government relies on is the substantive evidence of Montrell's statement. The government makes arguments about coercion. But Montrell admitted that he made those statements on the videotape, did he not? Yes, he did. Once he made that admission, it would seem to me that would be a fair argument for the prosecution to call to the jury's attention that you have an admission that the videotape and the statements made on the tape was accurate. Then the next question is, once he's made that admission, is it proper then to admit the tape to further corroborate the admission that Montrell has made that he made those statements? And somewhere in your papers, I think you challenge that, but the government, I think, responds with that Lashmet case, a Seventh Circuit case where Judge Flom specifically says that it is permissible to admit the impeaching evidence, the extrinsic impeaching evidence, even though the declarant may have admitted it was made. Yes, Lashmet does support the government's argument. How do you say that, Lashmet? I think, I'm just guessing, Lashmet. So did I. Maybe the government knows better than I do. It's their case, not mine. It's cited in both of our briefs. But I think that there's case law on our side as well. We cited the Webster case. The more long, I think it's Inns case, both from the Fourth Circuit, that talk about this court's decisions in Webster and other cases, talk about the government's purpose, overall purpose, in admitting this evidence. And the Moreland case says the government essentially set up a straw man to get this evidence. And I think that's what happened here, that the government set up a straw man in order to get all this evidence and particularly the videotape. Well, can I sort of challenge you for a moment on that? Yeah. When you said they set up a straw man to get in all of this evidence, the sworn testimony is admissible under 801D1A. Yes, Your Honor. You don't need a straw man to admit that. That's admittable. That's declared non-hearsay by virtue of the federal rules. Exactly, yes. And that's the reason why I call our argument a little bit circular, is it goes back to the coercion then. Is that that evidence just flatly is admissible under the rules. Is it your theory that the manner in which the government presented it was wrong, that by calling Montrell and then using the 801D1 evidence that that was improper somehow? No, not the mechanism used. The fact that that evidence stemmed from a coerced statement is the challenge that we're making to that. The government's process is allowable under the rules. That's not the issue that we're raising, certainly. I did, before I let my counsel have a turn, I did want to mention quickly the sentencing issues. The government's conceded that it should go back for resentencing for the court's failure to address mitigation argument. Of course, we are admitting that. There are two enhancement issues as well, the obstruction of justice and vulnerable victim. I won't spend a lot of time on them, but the basis of our first part is that the district court also failed to make findings about those two enhancements. While the court may not decide those issues on the merits, we ask that the court remand for the court to reconsider those issues as well, for a full remand. I will defer to my co-counsel. Okay, thank you, Ms. Richardson. Thank you. Ms. Benjamin? Good morning. My name is Allison Benjamin, and I am here on behalf of the appellant Keon Thomas. Courtroom practices, which pose a threat to the fairness of the fact-finding process, must bear close judicial scrutiny. And here, at closing arguments in this case, the presence of approximately 20 firefighters sitting next to each other, about three to four rows deep, in unison all in firefighter apparel, presented an unacceptable risk of impermissible factors coming into play. And in looking at the presence of the firemen at closing arguments, it's important to look at the context of the trial. Is it that they were wearing uniforms? Is that what bothers you? It's the large number, the identifiable presence as firefighters, and the sympathetic message that they were sending to the jury altogether, which bothered me. How can you prevent the friends of a victim from coming to a courtroom? Nobody is suggesting that the firemen couldn't be present in the courtroom. That's why I asked you whether it was the uniform. Correct. It is. So if they were dressed in street clothes, you wouldn't be arguing? Absolutely, we would not. Then they would be indistinguishable from any other courtroom spectator. They wouldn't be actually wearing a message on their chest, which is what they were doing. And in looking at the context of this trial where we- You say they're wearing a message on their chest? Absolutely they are. No, no, that's not right. They're conveying a message of whatever you want to call it, whether it's sympathy- Yes, sympathy, precisely. Absolutely, but sympathy is- Well, but you often have family of victims and so on in the courtroom. That is correct, you do. But they don't often wear such an identifiable symbol. This is somewhat similar to the symbol in Norris v. Risley where it was a rape trial and there was a button on the chest. No, no, that's completely different. It's sending- No, because that button was signaling a movement, the anti-rape movement. It wasn't the family or friends of the victim. That's a big difference. When you have a trial, you're always going to have in the audience the friends or family of the victim. That's perfectly standard. As well as the defendant. So that's why all you're objecting to is the uniform. Correct. I'm objecting to the uniform and the large presence. It wasn't just one fireman sitting in the audience. It was 20 firemen. This was a case in which the offense- Well, do you think that intimidates the jury? They get scared the firemen will start hosing them down if they acquit? Is that- Intimidation does not always happen with a fist. What is the intimidation? The intimidation is a sympathetic play reminding the jury- That's not intimidation. That's sympathy. Where's the element of threat? That's what intimidation is. They're going to beat up the jurors if they acquit? Intimidation does not always happen with a fist. What is the intimidation? The intimidation is that this is who we are. This happened to us. We protect and serve you. Yes, precisely. That's not intimidation. That's expression of sympathy. It's still a message to the jury that didn't come from the witness stand at trial. And courtrooms always regulate what happens, what evidence is presented. You don't think the juries notice when they're relatives and supporters of a party in a courtroom? They may notice, but it's difficult to tell the difference between who's supporting what side. The firemen made this in an election. They made it an assembly of numbers in how many people support this victim. They wanted to remind the jury that the person who died- To follow up on Judge Posner's question, the same happens with the person who may be accused of murder and the decedent's family appears in the courtroom. Yes, but they do not come wearing a uniform. Well, but if they know it's the decedent's family, they don't need a uniform. But it's difficult at that point in time when everybody is dressed in civilian clothes to decide who is supporting what. You want to dictate how people dress when they come into the courtroom. In some circumstances, yes. If they come into a courtroom in order to convey a message to a jury, their behavior should be restricted and their message should be restricted. Juries must remain impartial. A trial is to decide guilt or innocence. What makes you think that their presence was decisive in the conviction? Well- Not exactly a close case. No, what we're looking at is an unacceptable- No, we're also looking at if there was error in telling people- not allowing people to decide what to wear. Is your view that that is reversible error per se without any consideration of prejudicial effect? Well, I think it's difficult- No, yes or no? Yes. No, you're wrong. It's a factor, but it's not conclusive. If you look to the history of how the courts have looked to the way spectator conduct or any other conduct, whether it's the prison garb that somebody is wearing, a defendant at trial is wearing, or whether it is some type of practice that the courtroom implements, they look to whether or not the prejudice is inherent. And the reason that the courts do that- No, no, you're missing the point. Prejudice is a factor. It's not conclusive. If the evidence is very one-sided against the defendant, the fact that he may have had some visible supporter in the audience section is not a valid ground for invalidating the judgment. This isn't one valid supporter. This is an entire fire department. You're missing the point. You have to show that the prejudice was enough to swing the verdict. And that depends in part on how one-sided the evidence is. Well, here in this case, this case had pended since 2000. And now when we're at the second trial, it's 2012. So for 12 years, this case had pended before the court. And 12 years later, the firemen still feel so strongly about this case that they show up in mass force to closing arguments. And I propose that they did that to remind the jury as a punctuation mark to what the first few witnesses testified to at the beginning of this trial. And the testimony at the beginning of the trial was testimony essentially which conveyed how although firemen are first responders and often save strangers, at times firemen are affected by tragedy too and they have to save their own. And it went into the son of Frank Frun, in this case, James Frun, was called to the scene of the homicide. He was allowed access into the scene because of his status as a firefighter. And when he entered the scene, he saw his father lying in a pool of blood. That was extremely emotional testimony to come from a fireman who's used to caring for people who now has to be cared for by other firemen. Do you think that testimony was improper? I don't think that was improper, but I think the punctuation of that testimony and the validation of that testimony by an outside force, which in this case was a large number... What do you mean validation of the testimony? Was someone contesting his evidence? No, somebody is supporting the evidence. Then what is the... You don't need support for evidence that no one is questioning. You're saying, which strikes me as totally implausible, that if there hadn't been firemen in uniform in the audience, people would have said, well, that guy just said it. We don't believe him. But you're saying there's no contest. No, what I am saying is that in this case, there was an outside factor apart from what was admitted in the evidence. Look, if a witness said two and two is four, would you say that if there were a bunch of mathematicians in the audience that that would confirm that two and two are really four? You wouldn't say that, would you? That doesn't have the sympathetic effect. Would you say that or would you not?  Oh, it would depend. It would depend on the context, and it would also depend on whether or not the jury even knew that those mathematicians were in the audience. But typically, you wouldn't know that. You don't know that unless someone comes to court and announces who they are to the jury. So you're really saying that, yes, if the mathematicians were recognized there, the jury would say, well, you know, we weren't sure two and two was four, but all those mathematicians sitting there, little hats saying I'm a mathematician, that testimony must have been correct. I am saying that that could influence the jury's verdict. It's an impermissible risk for somebody to make an announcement from the spectator. There are some verdicts that don't need to be influenced by spectators because it's an open and shut case.  Your time has expired. Thank you. So we'll hear from Mr. Holler. Are we using paper for white? Is that what's going on? Yes. Okay. Thank you, Your Honors. May it please the Court. None of the defendants' claims in this case would justify reversing their convictions. Starting with the issue raised by Ms. Christensen on Montrell's testimony, the grounds that are being, the primary grounds that are being raised here are totally different from the grounds that were being raised in the trial court. The trial court, there were objections to admission of the grand jury testimony as substantive evidence. The defendants have now conceded here on appeal that the grand jury testimony was admissible as substantive evidence. The grounds for not admitting the tape into evidence was that it was extrinsic evidence and that Montrell had admitted making the statements. The defendants, I believe, have conceded that Lashmet forecloses that particular argument. So all of the arguments that the defendants made for excluding this evidence at trial, they've essentially conceded away or binding case law establishes is incorrect. Thanks for the pronunciation of Lashmet. Your Honor, the case was decided in 1992 from Illinois, so I don't know that I necessarily know that that's correct, but that's what I'm going with. The argument that they now are raising, the primary argument they're now raising, as I see it, is a coercion argument, is an argument that regardless of the fact that the rules of evidence permit admission of all of this testimony, it should have been excluded for some sort of constitutional coercion reason. That was not ever raised at the trial court, which means at minimum we're on plain error if not having this plain error. Stay with that for a moment. Is there any authority at all that would extend the constitutional rights to afford to the accused to a witness that's going to testify against the accused? Well, Your Honor, I think that the Smith, or I'm sorry, the Samuel versus Frank case decided by this court in 2008 is probably the case that I would look to on that, and in that case the court noted there's some kind of conflicting, there's some kind of conflict on that. The court, though, that was in a 2254 context, said at minimum it's not clear for 2254 purposes that that's even a right, that the witness shouldn't be suing in tort, because generally this coercion theory stems from the Fifth Amendment, from the right against self-incrimination, which is not clear. Which is afforded to the accused. Yes, which is afforded to the accused. So I think we're on, at best, plain error, and when the law is unclear, I don't think that the error can be plain. To be clear as well, the facts are not plain either. If the defendants had raised this in the trial court prior to trial, or perhaps even during trial, the district court could have stopped everything and said, I need to resolve a factual dispute here. Montrell is claiming that he was coerced. He's claiming that the two police officers and the Indiana prison official coerced him. Well, traditionally that issue usually goes to weight, not admissibility, does it not? Typically it would go to weight, not admissibility, but I'm saying even if the court were to think that this was clear, which it's not, that as a matter of law, coerced statements of third parties can't come in, then there's still a factual dispute. So there's both, the question of whether there's legal error is not plain, and the question of if that was a legal error, whether the facts would support that legal claim are also not plain, and this wasn't raised in the trial court. So I don't think the defendants can really get off the ground with their coercion claim here. To be clear, we dispute, the agent testified that none of this was true, that he wasn't coerced. He was sat down and talked to for several hours, which is permissible, and then the defendant testified. And again, what I think Lashmet says, and what this court had said as well, is what's the best evidence of what the prior statements were? And despite my colleague's repeated claims, these statements were admitted, the out-of-court statements were admitted for impeachment purposes. The jury was told that five times. Five times they were told that this was admitted for impeachment purposes, and although they do raise some claims about government closing argument, they don't make any claim that the government ever argued that these videotaped statements should be relied on substantively because the government never argued that. Would it have been better to, adopting for a moment the issue raised by the appellants, would it not have been better to complete that instruction and advise the jury that the statements could not be considered for the truth of the matter? I suppose that the district court could have done that. The pattern instruction, I don't think required that. I think that was bracketed language. I think at the time, if you tell the jury it can only be considered for impeachment purposes, I think that's enough. But to be clear, in one of those five instances, in the closing instructions, that addition was added. So the jury was told that when they were going back to deliberate, which is, I mean, you know, you cannot overburden the jury with instructions in the middle of trial when they're still supposed to be taking in evidence. They haven't heard all the evidence yet. And I don't think you want to start giving really long instructions about really specific pieces of evidence that might overly highlight that evidence. But the jury was told five times, they were told before the tape was played, this is to be only used for impeachment purposes. They were told after the tape was played because the tape was 35 minutes. They were reminded of that again. In closing argument, they were given a general instruction that any out of court statements not made under oath were admissible only for impeachment purposes. They were given a specific instruction regarding the Montrell testimony and regarding certain other pieces of testimony. And with the Montrell testimony, they were told the more complete instruction, Judge Jarrah, this may only be used for impeachment purposes. It may not be used for any other purpose. And then when the jury asked, as one of their questions to review the tape in closing, during deliberation, they were again reminded before they were shown the tape, remember you can only use this tape for impeachment purposes because they also wanted to review a tape of Keon Thomas. And they were told that they could, of course, use that for substantive purposes. So the jury was well instructed on this point. Was any objection made to the presence of the firemen in the audience? No, Your Honor. There was no objection that was made. There were three defense lawyers for these two defendants, and none of them said anything. And so I think that's the first basic difference between this case and all of the other cases that the defendants cite is that in all of those cases, the defense lawyers stood up and said, we object to people in the gallery wearing women against rape buttons. We object to the fact that there are 27 police officers, or that there are a whole bunch of prison guards, and that this whole town is basically a prison town. We object to that presence there. And if the defendants had stood up and said, look, we have an objection to the fact that there are 20 people wearing Hammond Fire Department uniforms, the district court could have said something, and we would be on a different standard of review. The district court might have said that they couldn't be there or that they had to move around or that they should put coats on or something. I'm sorry, Your Honor. In addressing this issue, the appellants also point out that a juror had been associated with the fire department, had been a deputy chief or something of that nature. Was there any attempt at the time of trial to excuse that juror for cause or preempt that juror, or were they out of preempts at that time? They were not out of preempts at that time. There was no efforts by them to strike the juror for cause or to preempt the juror. And it's fair to infer that the defense was fully aware at the time of the connection of the victim through his son with the fire department. Oh, certainly, Your Honor. I mean, there was a whole previous trial on this case, so they had all of the prior trial testimony, and firefighters had testified at the prior trial. That issue was not raised during Vordier, I take it. There were questions in Vordier. As to the retired deputy chief. It is in the record where his Vordier is. There were questions that were posed, I believe, by the government. He was the fire chief of East Chicago, Indiana, which is a town that the government has had some prosecutions of government officials on. And so there were a number of questions about his ties to others in the government, whether he had ever been a witness in any corruption trials, things of that nature. But I don't think there were any questions by the defense about it. There was no attempt by the defendant. That was my question. No attempt by the defendant to exclude that person. No, Your Honor. It's a different fire department. The witness was asked, like all the witnesses, whether he knew any of the, I'm sorry, the juror was asked whether he knew any of the witnesses. He said no. There was no effort to strike him. There was no effort at any point. In fact, that particular juror, at one point, I think had the trial was going along or there was some kind of a trip, and he was even asking, you know, am I going to miss this trip? And the defendants even said, no, we want this juror. We want this juror to stay. We don't want to excuse him. So they, you know, and again, if they had thought that this was, I don't, look, there wasn't an evidentiary hearing, so there's nothing in the record on this point. But I don't think that there certainly is no evidence in the record that the firefighters were there intentionally to intimidate the jury. I am sure that they were there out of sympathy for their colleague, whose father had been murdered and who has now had to go through two lengthy trials to get what he perceives as justice for that murder. This case was tried in Hammond? Yes, Your Honor. Yes. But I don't, there's certainly, you know, the standard is was there a, was there an atmosphere of coercion or intimidation? And the district court found post-trial that there was not, that they sat there respectfully. So this isn't like the Manny case from this court, where gang members were flashing signs, right? I mean, if the firefighters are flashing some kind of code or sign to the firefighter on the jury, that's a different, that's a completely different case. But when there's no objection and there's no evidence that they're projecting any kind of atmosphere of coercion, I don't see how that applies in this case.  Yes. Yes, Your Honor. I'm not sure that there's any evidence that they were there or at least en masse at any other point in the trial. But, I mean, certainly this was a difficult case. There were members of the victim's family that were present in the courtroom throughout. The reason I ask you in Hammond, the courtroom is relatively large. Was this, compared to the size of the firefighters, compared to the rest of the audience, percentage-wise, is what I was trying to get a sense of. It's not clear from the record how many others were there. I mean, I think that the courtroom is probably the size of this courtroom. So I don't know if, you know, and I'm sure it was about as packed as this courtroom currently is. So I don't know that if there were 20 people over here. I can't say whether the jury did or didn't notice. But the question is just, is it the case essentially. We don't have a factual record of any. We don't have a factual record that would support a finding that the district court was essentially required to sua sponte, stand up and say, hey, we need to do something about this. Because that's really what they're asking. They're saying, we didn't object, but it was incumbent upon the district court to raise this issue. Well, it's different if the courtroom seated 120 people and there were 20 firefighters. That means that there's room for another 100. I mean, the facts would show that if there had been a hearing. Sure, sure. I think that that's correct, but I think that, like I said, there were relatives and friends of the defendants. There were relatives and friends of the victims. And as we pointed out in our brief, the idea that jurors don't know that in a murder case that there are going to be people on both sides who care deeply about what the verdict is, I think is extraordinarily naive. They are instructed to set sympathy and prejudice aside, and I think that jurors strive very conscientiously to do that. They know that their verdict is going to have ramifications. They have to, and that's why they take their jobs so seriously. But the idea that any of the jurors... I mean, and really, 11 of the 12 jurors have no connection to the fire department, and I think at least the vast majority of them did not live in Hammond. So I'm not sure why any of them would be influenced in any respect, let alone, you know, the fire chief or any of the others. Can I ask you a different kind of question? About sentencing. Yes, Your Honor. The vulnerable victim enhancement. Is there evidence that Freund was reaching for a gun? Well, there's conflicting evidence on that point. I mean, the evidence... I think that the physical evidence suggests, from the medical examiner, suggests that he was shot very close, within two feet. So he was definitely shot not... You know, there was testimony... Most of the testimony comes from the defendant's admissions to other witnesses. So there is a version that one of the defendants told a witness that essentially says, we came in and the defendant pulled a gun and I had to shoot him. That is a version of events. It's not clear that that's totally consistent with him being only a foot less than two feet away from the victim when he was shot. The victim was deaf, the victim was older, and so I'm not sure that that's entirely consistent with the record. There was conflicting evidence. The district court stated that it adopted the findings in the PSR, which suggested that the defendant was older, the defendant was deaf. And really, as long as... I mean, under this court's precedence, as long as the defendants essentially knew that the victim was older, that's enough. But is there any reason to think they knew he was deaf? I'm not sure how... The evidence that would suggest that they knew that he was deaf, Your Honor, would be, I guess, come from two factors. One would be there was a very loud door buzzer that sounds when the door opens. And other witnesses testified that the victim could not hear that door buzzer. That when the door... No, I'm not questioning that he's deaf, but you can imagine a case where the robber says, you know, hands up or something, and the victim, because he's deaf, doesn't hear, and they shoot him. But is there any suggestion of a connection between his deafness and the murder? I don't know if there's any suggestion that the deafness caused the murder. I mean, the deafness probably made it easier for the defendants to perpetrate the robbery because the door buzzer is sounding, these men are coming in. If he's bent over, which it looks like he was eating a sandwich and reading the newspaper, he's not going to hear any of that until they're right close to him. So I think there's evidence that does suggest that his deafness potentially could have contributed to... But the judge didn't discuss that, did he? The judge just relied on the findings in the PSR, and I don't believe... The findings in the PSR do discuss the door buzzer. They do discuss the deafness. They do discuss that the defendants did plan and discuss that they were robbing, so it was possible that they had cased the place before. But we don't have any direct evidence that the defendants knew prior to the robbery that the victim was deaf. And one other question about sentencing. So Keon Thomas had a very bad childhood and general history. But I don't think the judge discussed that, did he? Your Honor, we've conceded that there needs to be a remand for the judge to discuss the factors. I think both... I see. It's not just the supervised release. No, we've said that the judge needs to explain his sentence, and under the court's precedence, I think, yes, there needs to be full... You're conceding that the case should go back for a wide-open sentencing? Well, I mean, I don't know that the... I mean, I think that the... In other words, start from scratch, is what I'm saying. Well, I think that the court... I would hope that the parties would agree that all of the evidence that's already been admitted in these lengthy sentencing hearings, we don't have to, like, redo, but... Well, that's not what I meant. I'm not talking about... Here we're suggesting that maybe there ought to be evidence with regard to the vulnerable victim when that goes back. Oh, I mean, I think that's at the discretion of the court. I mean, keep in mind, Judge Kennedy, the guideline is going to be life no matter what, okay? If the vulnerable victim enhancement goes away, the defendant's guideline goes from 43 to 43. All the other factors are the same. I mean, you know, the two-level vulnerable victim pushes it up to 45, but by operation of law, 43 is the top, so it goes back to 43. So why are we going to even consider a vulnerable victim when it... We've argued that it's harmless, but, I mean, I'm just responding to the court's questions about whether it should have been imposed or not. I mean, I think... I'm more concerned about Keon Thomas's background and whether the judge considered that. Your Honour, it's not clear... And that's why we've conceded that this case does need to go back for resentencing. I mean, I think that the court... I mean, our position, I guess, would be that the court could or should say that the guideline issues are done, that enough was presented, but that what it needs to go back for is, okay, folks, the guideline range is life, we're done with that, now let's decide, did Keon Thomas's or Stiles-Taylor's background justify a sentence below life, or did the fact that they'd committed prior violent felonies and did the heinousness of this particular crime and all of the other factors justify the life sentence that is normally imposed for murder? Yes, we think that the court does need to further explain its sentence and reconsider and potentially impose a lower sentence, although certainly the government thinks that is the reasonable sentence and, barring something new coming up, would argue for that sentence. I guess my concern is, although it certainly affects the mitigating factors concerning the life experiences of this defendant, but how would you award the remand? Well, I mean, I think the court could go through and could go, I mean, just going through, go through the conviction issues, go to the guideline issues, and on the guideline issues say, we don't think that the defendants have shown any error in the guideline calculations, then turning to the question of the reasonableness of the sentence, the defendants have shown error, therefore the matter should be remanded for resentencing in light of the opinion. And if the court has essentially resolved all the guideline issues, then there's nothing to argue about on remand. If the court thinks that we should revisit the guideline issues, it can certainly, I mean, you can write your opinion however you want, Your Honors. Well, yeah, but a lot of times counsel don't realize that how they argue the case makes a difference in how we formulate the... Well, I hope I've explained. I mean, we would say that the court should affirm the guideline issues, but if the court thinks that there needs to be more finding on the vulnerability of the victim or the obstruction enhancement, then it could certainly ask that... I don't know that we have any... I mean, we presented the evidence we had on the vulnerable victim enhancement, so if the court thinks that's not enough for the enhancement, then the court can say that that's not enough. I mean, that's certainly the court's prerogative. We think it is enough, but ultimately, if the court takes that enhancement away, the guidelines don't change, and all the facts are still the same. The victim still was deaf, the victim still was older, the victim still was robbed of lots of violent firearms by these gentlemen who wanted to use them to go buy more drugs and become bigger drug dealers. So, I think that's where we are. Okay. We would ask the court to affirm the convictions and remain for re-sentence, and thank you. Okay, thank you, Mr. Holler. So, Ms. Christensen or Ms. Benjamin, do you have anything further? Ms. Christensen? Hi. I'll just briefly respond to quite a few things. The videotape was not complete. It was only the last 35 minutes of the hours-long interview, and it had been, I admitted, by the government cleaned up. That was one reason that it was... should not have been relied on so heavily. As far as objections, on page 54 of the May 21st transcript of the trial, the defense counsel asked for a continuing objection to Montrell's testimony, the impeachment, the videotape, all of that. It had been objected on nearly every page of Montrell's testimony, so the government's argument that this was not objected to is simply wrong. The government also admitted, it's on our joint appendix, page 19, that they were admitting the video for substantive purposes. The district court instructed the jury as to impeachment, but refused to add that last part about not to be used for any other purpose, and that was an error. Yes? Let me ask you a question. In your reply attacking the use of Ms. Payton's testimony under 801D1, you point out that because she said she had no recollection, that although she was present in court, she was not, in a realistic, effective sense, subject to cross-examination. True. That rationale was expressly overruled, and you cite that DiCaro case, United States v. DiCaro. That rationale was expressly overruled three years later after DiCaro going United States v. Owen. That was the prison guard that was brutally attacked and had no recollection, except he did recall making an identification to an FBI agent who came in and testified. And Justice Rehnquist held that because the person was physically in the courtroom and subject to cross-examination, he complied with the requirements of 801D1A. Great. She had no memory of any of it, however. Well, that was the same case with the prison guard. Owen's, I think, expressly overrules that. And then this court, a number of years later, because the issue finally arose here, adopted the Owens rationale. So I believe that case that you cited, DiCaro, is not good law. It's possible, Your Honor. I apologize for not picking up on that when we made the argument. I see my time is up. I'd like to just one sentence about the sentencing. We do think that it should be a full remand for the issues in our brief, particularly. Both of those enhancements were applied and should not have been. And while it would not change the guideline range, it would still be life in prison, the district court needs to consider all evidence and all mitigation. And the fact that Mr. Freund was not considered a vulnerable victim would be mitigation at this point. I would also add, Judge Posner, that Stiles-Taylor and Keon-Thomas both had incredibly terrible childhoods. Yeah, but Keon-Thomas' is worse. I don't, I'm not as familiar. Mr. Stiles, Mr. Taylor is the one who was fed beer in his baby bottle, pot smoke blown in his face by his mother when he was an infant. They're both terrible. I don't think we need to argue. The fact of the matter is that the district court didn't decide or didn't make any findings on that. Given that, given the lack of findings on any of the enhancements that were challenged, we think there should be a full remand. Not necessarily filing more things, I think a lot of things have been filed, but to allow defense counsel to argue and for the district court to consider that evidence and make actual findings. Do you have any question about imposing conditions of supervised release on someone who's sentenced to life in prison? Well, Your Honor, as you know, we challenge conditions of supervised release in nearly every case unless it would, it doesn't make a difference. And in this case, when the defendants are both facing life, we had much bigger issues, much bigger fish to fry as the term is. It was not necessary to challenge the conditions of supervised release. Upon resentencing, if the district court decides that the proper sentence is not life and there is a possibility that either one of these defendants will be on supervised release, I think that would be the time to open up the supervised release issues, supervised conditions issues. At this point, it's not necessary because of the life imprisonment. Okay, thank you, Ms. Christensen. Thank you. Ms. Benjamin. Ms. Benjamin. I believe all of my time had expired during the last session, but if there are any questions that I may answer for the court. I guess not. So thank you very much. And you and Ms. Christensen were appointed, were you not? Yes, Your Honor. Well, we thank you for your efforts on behalf of your client. We thank Mr. Hollis. We'll move on to our next case, Kramer v. United States. Mr. Strafer.